UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DONNA ALLISON, Individually and as a
representative of a class of similarly
situated persons, on behalf of the L
BRANDS, INC. 401 (K) SAVINGS AND
RETIREMENT PLAN,

      Plaintiff,

      v.

L BRANDS, INC., *et al.*,

      Defendants.

Case No. 2:20-cv-6018
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

<u>**OPINION AND ORDER**</u>

Currently before the Court is the Defendants' Motion to Dismiss for Lack of Subject

Matter Jurisdiction (ECF No. 7) and the Defendants' Motion to Dismiss for Failure to State a

Claim Upon Which Relief Can Be Granted (ECF No. 8).  For the reasons stated below, the Court

**DENIES** the Defendants' Motions.

## I.

Plaintiff Donna Allison brings this putative class action against her former employer, L

Brands, Inc., L Brands Service Company, LLC, and the Retirement Plan Committee of the L

Brands, Inc. 401(k) Savings and Retirement Plan (collectively, "Defendants").  Ms. Allison

participated in the L Brands, Inc. 401(k) Savings and Retirement Plan ("L Brands Plan") that is

regulated by Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461.

The L Brands Plan is a defined contribution, single-employer 401(k) plan, which allows

participants to invest in a number of different options offered by the Plan, such as various mutual

funds, collective trusts, L Brands stock, and a self-directed brokerage account.  Wells Fargo

Institutional Retirement and Trust was the designated recordkeeper of the L Brands Plan throughout the relevant period, and as such maintains records related to accounts in the Plan, and various other administrative functions associated with the Plan.

**A.     ERISA**

ERISA is a "comprehensive and reticulated statute," which is designed to protect employee pensions and benefit plans by, among other things, "setting forth certain general fiduciary duties applicable to the management of both pension and non-pension benefit plans." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993); *Varity Corp. v. Howe,* 516 U.S. 489, 496 (1996).  "Congress enacted ERISA 'after almost a decade of studying the nation's Private Pension Plans' and other employee benefit plans.'"  *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1016 (S.D. Ohio 2006) (citing *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 569 (1985)).  Employers are not required to establish employee benefit plans, but if they choose to do so, they must abide by ERISA.  *Id.*

"Through ERISA, Congress endeavored to ensure that if an employee was promised a benefit, she would receive it."  *Id.* (citing *Lockheed Corp. v. Spink,* 517 U.S. 882, 887 (1996)). Thus, ERISA "protect[s] . . . the interest of participants in employee benefit plans and their beneficiaries . . . , by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and access to the federal courts."  *Id.* (citing 29 U.S.C. § 1001(b)).  ERISA accomplishes this goal by mandating that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries.  *Id.* (citing 29 U.S.C. § 1103(a)).

ERISA requires such plans to name fiduciaries who have the authority to control and manage the operation and administration of the plan. *Id.* (citing 29 U.S.C. § 1102(a)(2)). These fiduciaries need not be independent parties; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. *Id.* (citing 29 U.S.C. § 1108(c)(3)).

**B.      Plaintiff's Complaint and Defendants' Motions**

Ms. Allison filed this purported class action that alleges violations of ERISA, and asks the Court for declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132.  She also seeks equitable, legal, or remedial relief pursuant ERISA § 409 and 502, 29 U.S.C. §§ 1109 and 1132.

The Defendants' filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 7), and Plaintiff filed a Memorandum in Opposition (ECF No. 10).  The Defendants then filed their Reply Brief in Support of their Motion. (ECF No. 26.)  On the same day as filing the first motion, the Defendants also filed a Motion to Dismiss for Failure to State a Claim Upon Which Relief May be Granted. (ECF No. 8.)  Plaintiff filed her Memorandum in Opposition (ECF No. 11) and the Defendants filed their Reply Brief (ECF No. 27).

When a defendant seeks dismissal for both lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must consider the 12(b)(1) motion first because the 12(b)(6) motion will become moot if subject matter jurisdiction is lacking.  *Moir v. Greater Cleveland Regional Transit Authority,* 895 F.2d 266, 269 (6th Cir. 1990); *City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F. Supp. 971, 975 (S.D. Ohio 1993).

## II.

**A.    Federal Rule of Civil Procedure 12(b)(1)**

"When a defendant moves to dismiss on grounds of lack of subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003) (internal citations and quotations omitted).  In reviewing a motion to dismiss for lack of subject matter jurisdiction, "the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Id*. (internal citations omitted). "However, where a defendant argues that the plaintiff has not alleged sufficient facts in her complaint to create subject matter jurisdiction, the trial court takes the allegations in the complaint as true." *Id*. (internal citations omitted).

**B.    Analysis**

The Defendants move to dismiss Ms. Allison's complaint, arguing that she lacks standing because, they posit, she released her claims under the terms of the Separation Agreement she entered into in 2019 with L Brands that contains a provision (set out in full *infra*) in which she relinquished any legal claims "with respect to any aspect of her employment" or her "separation of employment." (Separation Agreement at 2, ECF No. 7-2; Defs' Mot. at 1, ECF No. 7-1).  In response, Ms. Allison contends that her claims are brought pursuant to ERISA § 502(a)(2), which are "claims brought in a representative capacity on behalf of the Plan and therefore are not subject to the provisions of the release." (Pl's Resp. at 3, 7, ECF No. 10).

**1.    Standing**

When participants bring suit on behalf of the plan under ERISA § 502(a)(2), they must satisfy both a statutory and constitutional standing component.  *See Glanton ex rel. ALCOA*

*Prescription Drug Plan v. Advance PCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (holding that plaintiffs can bring claims on behalf of a plan "so long as plaintiffs otherwise meet the requirements for Article III standing."); *see also Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007) (affirming the lower court's dismissal of plaintiff's claims under §502(a)(2) because the alleged injury was "too speculative to establish constitutional standing."). Thus, to properly decide the Defendants' 12(b)(1) motion, it is necessary to analyze both forms of standing as they relate to the facts of this case.

### a.    Statutory Standing

Plaintiff was entitled to bring suit on behalf of the Plan because she is a "participant" within the statutory definition.  Under ERISA, a "participant" is defined, in relevant part, as "any . . . former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7).  The Supreme Court has held that this definition encompasses former employees who may have a "colorable claim to vested benefits," particularly such that they would prevail in a suit concerning those benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117–18 (1989).

In the context of ERISA § 502(a)(2) suits concerning defined contribution plans, "'if the plaintiffs win their case by obtaining a money judgment . . . , the receipt of that money will constitute the receipt of a plan benefit.'"  *Bridges v. American Elec. Power Co., Inc.*, 498 F.3d 442, 445 (6th Cir. 2007) (citation omitted).  Therefore, a judgment in favor of restoring plan benefits would directly inure to those harmed by the fiduciary breach.  *See Evans v. Akers*, 534 F.3d 65, 73 (1st Cir. 2008).  As such, it has been held that former participants of a defined contribution plan who were enrolled during the class period are "participants" pursuant to the statutory language of ERISA.  *Id.* at 71; *Bridges*, 498 F.3d at 445.

Similarly here, the Plan in question is a defined contribution plan. Although Ms. Allison is a former participant in the Plan, she has participant standing under Section 502(a)(2) because she still retains a colorable claim for vested benefits. For instance, in the event that her lawsuit on behalf of the Plan is successful, a restoration of benefits back to the Plan would result in a financial benefit to individual participants. Thus, Plaintiff sufficiently meets the requirements for statutory standing under ERISA § 502(a)(2).

### b.    Constitutional Standing

The Constitution limits the jurisdiction of the federal courts to a "Case" or "Controversy." U.S. Const., art. III, § 2, cl. 1. One of the requirements of a case or controversy is that the plaintiff has standing to sue. *Duncan v. Muzyn*, 885 F.3d 422, 427 (6th Cir. 2018) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 856 (2016)). Constitutional standing consists of three separate elements that must be satisfied. The plaintiff must have a (1) concrete and particularized injury-in-fact that is; (2) fairly traceable to the challenged action of the defendant and; (3) can likely be redressed following a favorable decision by the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). If a plaintiff fails to satisfy these elements they lack standing and a court must dismiss the complaint for a lack of subject matter jurisdiction. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).

Ms. Allison also satisfies the requirements of Article III standing. In order to demonstrate constitutional standing, a plaintiff must be able to show that he or she suffered a concrete and particularized injury-in-fact that would likely be redressed following a favorable decision by the Court. *Defenders of Wildlife*, 504 U.S. at 560–61. The constitutional standing analysis differs depending on the kind of plan in question. The Supreme Court addressed this distinction as it relates to defined contribution versus defined benefit plans. *Thole v. U.S. Bank*

*N.A*, ___ U.S. ___, 140 S.Ct. 1615 (2020). With defined contribution plans, "the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk." *Id*. at 1619. Thus, any claims of fiduciary mismanagement on behalf of the participant of a defined contribution plan "identifies a concrete injury that is redressable by a court and falls within the scope of Article III standing." *Evans*, 534 F.3d at 75. *See also Harris v. Amgen, Inc.*, 573 F.3d 728, 735 (9th Cir. 2009) (holding that "[w]ith a favorable ruling, a defined contribution plan plaintiff alleging breach of fiduciary duty claims under Section 502(a)(2) can gain redress by 'su[ing] for an adjustment in the benefits designed to give him what he would have received had the formula been honored.'"). Benefits owed to participants enrolled in defined benefit plans, on the other hand, "are fixed and will not change, regardless of how well or poorly the plan is managed." *Thole*, 140 S.Ct. at 1620.

Here, Plaintiff is a former participant of a defined contribution plan that was managed by the Defendants. When Ms. Allison brought suit on behalf of the Plan, she consequently brought a claim for a concrete injury-in-fact. In light of a favorable ruling, Plaintiff's injury can be redressed by this Court because "[l]osses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis" and "by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans*, 534 F.3d at 74. Therefore, Plaintiff satisfies the requirements necessary to establish constitutional standing.

### 2. The Separation Agreement

The provision at issue in this case is directed at Ms. Allison's agreement to do the following:

> To release and forever discharge the Company, its parent, and all of their affiliated corporations and their directors, agents and employees from *any and all actions and causes of actions with respect to any aspect of your employment by, or separation of employment from, the Company*, including but not limited to any claims under the Age Discrimination in Employment Act and any other federal, state, or local laws with respect to race, sex, age and other forms of employment discrimination, breach of contract, tort or any other federal, state, and local laws relating to employment and its termination. This release does not prevent you from filing a charge of discrimination with the EEOC or any state or local fair employment practices agency. . . .  Of course, nothing stated above prevents you from enforcing the terms of this Agreement, nor do you waive or lose any rights that you have under the Company's retirement/stock purchase plan(s).

(Separation Agreement at 2, ECF No. 7-2) (emphasis added).

It is undisputed that the Defendants provided monetary and benefit consideration in exchange for Ms. Allison's entering into the Agreement with L Brands.  (ECF No. 7-2 at 2). The Defendants argue that this provision of the Agreement divests her of the requisite standing necessary to sustain this action.

To support its position, the Defendants contend that this case is on all fours with the District of Columbia case *Stanley v. George Washington University*, 394 F. Supp. 3d 97, 107 (D.D.C. 2019), *aff'd,* 801 Fed. Appx. 792 (D.C. Cir. 2020). In that case, the plaintiff brought suit under ERISA § 502(a)(2), as does Ms. Allison here, and the court found that the release provision contained within the "General Release" section of the plaintiff's separation agreement barred the claims from being heard.  ("Stanley's ERISA claims plainly fall within the language releasing 'any and all claims' 'for violation of any federal . . . statute.'").

Ms. Allison disagrees, arguing, *inter alia*, that "the release in *Stanley* arose out of a prior litigation settlement and was markedly broader than the relevant provision in the Separation Agreement."  (Pl. Opp. at 8, ECF No. 10.)  Specifically, Plaintiff states that

> the *Stanley* release provision provided that the plaintiff "forever releases . . . the [defendant] . . . from any and all claims . . . of any nature whatsoever . . . ." *Stanley*,

> 394 F. Supp. 3d at 104.  Notably absent is any language limiting the release to claims arising out of or related to the plaintiff's employment.

*Id*.  This Court agrees.

The language of the General Release in *Stanley* arising from a prior litigation settlement does not limit the release of claims to those "with respect to any aspect of [her] employment" as does the Agreement in the instant action.  Instead, the language in *Stanley* provides for the release of any and all claims "*of any nature whatsoever*."  And, the same section of the *Stanley* release states that "[i]t is expressly understood that this is a GENERAL RELEASE, and is intended to release claims to the fullest extent permitted by law."  *Stanley*, 394 F.Supp.3d at 104.  The release Ms. Allision signed has none of this general release language, and is unequivocally narrower in scope because it relates only to claims concerning her employment.

The Defendants also argue that *Stanley* "aligns with Sixth Circuit law, as the Court of Appeals has held that similar language barred the ERISA fiduciary breach claims central to this Complaint."  (Def. Mot. at 4, ECF No. 7-1) (citing *Taylor v. Visteon Corp.*, 149 F. App'x 422, 425 (6th Cir. 2005)).  In *Taylor*, the plaintiff and ninety others were terminated from Visteon as part of a reduction in force.  The defendant employer offered two choices for severance packages, indicating that the packages were non-negotiable and were the best offer that would be made.  The plaintiff and the other ninety accepted a package that included a release of claims. The defendant employer, however, offered other terminated employees a more generous package.  The plaintiff sued on behalf of herself and the others to recover the individual benefits that the later employees had allegedly gotten as part of their severance packages.  The *Taylor* plaintiff argued that, despite what she had been told, the employer "did negotiate and gave other employees different and/or additional benefits than those identified in the" severance package the plaintiff had received.  *Id*. at 424. The plaintiff contended that the employer's action at the

9

separation of employment violated the employer's fiduciary duties under ERISA with regard to her individual benefits. Thus, while the language in *Taylor* is similar to the language of the Agreement before this Court, the claims filed under ERISA are materially distinct. That is, Ms. Allison sues in a representative capacity while the *Taylor* plaintiff sued for individual employment benefits.

Moreover, the second provision in the *Taylor* severance agreement was titled "Rights or Claims that Survive," which included any "that may arise *after this agreement is signed*[.]" *Id*. (emphasis added). The plaintiff's main focus was "on the 'prior to' language, [arguing] that the release does not cover at-the-moment-of-signing claims but only claims in existence before (*e.g.,* "prior to" when) they signed the agreement." *Id*. at 425. The Sixth Circuit disagreed and affirmed summary judgment in favor of the employer. The appellate court's focus on contract interpretation as to whether the signing at separation constituted arising after the agreement was signed does nothing to guide this Court's consideration of the issues before it. Here, the interpretation is focused on whether filing an ERISA breach of fiduciary claim in a representative capacity constitutes a cause of action "with respect to any aspect of your employment by, or separation of employment*."*

Ms. Allison highlights a recent Second Circuit case that focused on the same type of claim she brings (*i.e.*, a fiduciary breach claim brought pursuant to ERISA § 502(a)(2) by a former employee in his representative capacity) in the context of a provision in an arbitration agreement. *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021). The agreement in *Cooper* contained similar language to the Agreement here, and purported to mandate arbitration of "all legal claims arising out of or relating to employment, application of

employment, or termination of employment . . . ." *Id*. at 175. The court framed the issue as follows:

> The question before us, then, is whether claims for fiduciary breach [under § 502(a)(2)]. . . are covered by the phrase 'all legal claims arising out of or relating to employment' used in his Arbitration Agreement.

*Id*. at 180.

The Second Circuit held that fiduciary breach claims under ERISA § 502(a)(2) were not covered by the phrase "all legal claims arising out of or relating to employment." The court explained that "a claim will 'relate to' employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment." *Id*. at 18. The *Cooper* court found it significant that the plaintiff's claims "hinge entirely on the investment decisions made by [the defendant]; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to [the plaintiff's] individual experience at [his employer]." *Id*. at 183. Similarly, Ms. Allison's claim here has no relationship with her employment experience with L Brands, Inc., but instead, completely arises out of the Defendants' alleged mismanagement of the Plan. Consequently, the Plaintiff's representative claims brought under § 502(a)(2) are not waived by the Agreement she entered into with the Defendant.

### III.

### A.     Federal Rule of Civil Procedure 12(b)(6)

In an ERISA breach of fiduciary duty action, the United States Supreme Court directed, "on remand, the Sixth Circuit should reconsider whether the complaint states a claim by applying the pleading standard as discussed in *Ashcroft v. Iqbal,* 556 U.S. 662, 677–680 and *Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 554–563." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 410 (2014) (reviewing whether an evidentiary presumption of prudence applied, finding that it did not). Thus, in evaluating Plaintiff's complaint to determine whether it states a claim upon which relief can be granted, the Court must construe it in favor of the plaintiff, accept the factual allegations contained in the pleading as true, and determine whether the factual allegations present any plausible claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (clarifying the plausibility standard articulated in *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

**B.    Analysis**

In her Complaint, Ms. Allision alleges three claims: (1) breach of fiduciary duty, (2) failure to monitor fiduciaries and co-fiduciary breaches, and (3) in the alternative, liability for participation in breach of fiduciary duty.

**1.    ERISA Fiduciary Duty**

Plaintiff alleges that the Defendants breached their fiduciary duties under ERISA, 29 U.S.C. § 1104(a), in three ways: (a) the L Brands Plan paid excessive recordkeeping and administrative costs; (b) the Plan's total plan cost was excessive; and (c) the Defendants' failed to utilize the least expensive share class.

An ERISA fiduciary "shall discharge his duties . . . solely in the interest of the participants and beneficiaries" and must act "with the care, skill, prudence and diligence under circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims." 29

U.S.C. § 1104(a)(1)(B). The duties charged to an ERISA fiduciary are "the highest known to the

law." *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 426 (6th Cir.2002) (quoting *Howard v.*

*Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996)). The duties of a fiduciary are set forth in ERISA §

404(a)(1) which states:

> [a] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances
> then prevailing that a prudent man acting in a like capacity and familiar with
> such matters would use in the conduct of an enterprise of a like character
> and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of
> large losses, unless under the circumstances it is clearly prudent not to do
> so; and
>
> (D) in accordance with the documents and instruments governing the plan.

29 U.S.C. § 1104(a)(1).

The Sixth Circuit has enumerated three general duties of pension plan fiduciaries under

ERISA § 1104(a)(1). The first is a "duty of loyalty" pursuant to which "all decisions regarding

an ERISA plan 'must be made with an eye single to the interest of the participants and

beneficiaries.'" *Berlin v. Michigan Bell Tele. Co.,* 858 F.2d 1154, 1162 (6th Cir. 1988) (citation

omitted). The second duty imposed under ERISA, the "prudent person" obligation, imposes "an

unwavering duty" to act both "as a prudent person would act in a similar situation" and "with

single minded devotion" to those same plan participants and beneficiaries. *Id.* Finally, an

ERISA fiduciary must "act for the exclusive purpose" of providing benefits to plan beneficiaries.

*Id.* Indeed, "[a] fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.'" *See AEP*, 327 F.Supp.2d at 819 (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002)).

### a. Recordkeeping and Administrative Costs

Plaintiff first alleges that the $56 annual recordkeeping and administrative fees paid by the participants in the L Brands Plan reflects a breach of fiduciary duties because the "average cost for recordkeeping and administration in 2017 for plans much smaller than the [L Brands] Plan (plans with 100 participants and $5 million in assets) was $35 per participant." *Id*. ¶ 26. Plaintiff compares the fees charged by the L Brands Plan, which has approximately $1.6 billion in assets and 33,761 participants, with the assessment of fees charged in industry publications. Plaintiff concludes that, "[g]iven its size, and resulting negotiating power, with prudent management and administration, the Plan should have unquestionably been able to obtain recordkeeping and administrative services for significantly lower than $35 per participant" but instead charges 60% more than that. *Id*.

Plaintiff further concludes:

Defendant[s] either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees. Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Wells Fargo and the other service providers at levels inappropriate for its size and scale. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings since the excessive fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

(Compl. ¶ 29.)

14

The Defendants move for dismissal of Plaintiff's breach of fiduciary duty claim because Plaintiff "grounds her claim solely on price, alleging that Defendants breached their fiduciary duties simply because Plan participants each paid $56 annually, rather than $35." (Defs' Mot. at 8, ECF No. 8-1.) The Defendants maintain that this claim must fail because "a $56 fee is not objectively unreasonable for the simple reason that it falls far below the amount deemed reasonable as a matter of law in other cases." *Id*. (citing as an example *Divane v. N.W. U.*, 953 F.3d 980, 984 (7th Cir. 2020), *cert. granted sub nom. Hughes v. N.W. U.*, 19-1401, 2021 WL 2742780 (U.S. July 2, 2021) and *Martin v. CareerBuilder, LLC*, No. 19-cv-6463, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020)). Defendants conclude that a claim based "solely on price does not plausibly infer misconduct by Defendants." *Id*.

The Defendants further argue that the claim fails because "the Complaint says nothing about the recordkeeping and administrative *services* provided to the Plan, much less in a way that supports a plausible inference that participants paid an unreasonable market rate for those services." (Defs' Mot. at 3, ECF No. 8-1.) The Defendants contend:

> The Employee Benefits Security Administration explains that the services afforded 401(k) plan participants vary widely, ranging from basic services to additional options that, naturally, cost more. Yet Plaintiff's price-focused theory ignores this, failing to account for the flexible analysis that ERISA demands of retirement plan fiduciaries who should defray "*reasonable* expenses" associated with administering a plan. 29 U.S.C. § 1104(a)(1)(A)(ii) (emphasis added). "Reasonable," however, does not equate to cheapest, and what is objectively unreasonable depends on more than price alone given the variety of plans and the multitude of varying service levels. ERISA does not require fiduciaries "to pick the least costly provider," whether for recordkeeping or any other administrative services, because "[c]ost is only one factor to be considered in selecting a service provider."

*Id*. (citing Employee Benefits Security Administration, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, at 1, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-

service-providers.pdf (last visited Feb. 12, 2021); (*see also* Reply at 8, ECF No. 27) ("Plaintiff shrugs off her obligation to address the scope or quality of services the Plan received and how they compare to other plans, which could have contracted for lesser or lower-quality services"). The Defendants' arguments are not well taken.

Plaintiff is correct that the "Defendants' 'not objectively unreasonable' argument misconstrues the complaint's allegations." (Mem. in Opp. at 8, ECF No. 11.) The Complaint does not allege "that $35 is the only reasonable fee." *Id.* Rather, Plaintiff's metrics utilized in the Complaint show that the fees were excessive compared to other plans and, as such, that Defendants failed to prudently monitor Plan expenses. According to *The 401(k) Averages Book* (20th Ed.), an industry publication, the "average cost for recordkeeping and administration in 2017 for plans much smaller than the [L Brands] Plan (plans with 100 participants and $5 million in assets) was $35 per participant." (Compl. ¶ 26.) This allegation, if true, shows that much smaller plans that do not have the benefits of economies of scale and negotiating leverage paid approximately $35 per participant as of 2017. Plaintiff's Complaint alleges that the L Brands Plan has paid the same administrative fees throughout the Class Period, despite its significant growth in Plan assets and participants, from which a reasonable inference may be drawn that the Defendants failed to leverage the Plan's economies of scale and negotiate to reduce such fees. (Compl., ¶¶ 31, 32 n.6; 2014 Plan Form 5500, at 2.)

Further, while this Court agrees with the Defendants that the reasonableness of the cost of the services provided is based on more than the bottom-line cost, Plaintiff does not rely merely on the bottom-line cost. Instead, Plaintiff relies upon numerous comparisons to support her allegations. As to those comparisons, the Defendants maintain that they are "derive[d] from a faulty reading of *The 401(k) Averages Book*." (Reply at 10, ECF No. 27.) Both sides go to

lengthy analyses of why Plaintiff has interpreted or misinterpreted the data.  However, the focus here is on whether these comparisons give rise to a reasonable inference that the Defendants are liable for the misconduct alleged.  And in this case, a reasonable inference may be drawn from these comparisons along with the other allegations made by Plaintiff that the Defendants may be liable for the alleged misconduct.

The Defendants additionally take issue with Plaintiff's reliance on *The 401(k) Averages Book* (20th Ed.).  They posit, "every single court examining claims based on *The 401(k) Averages Book* has dismissed them."  (Defs' Reply at 11, ECF No. 27) (citing *Wehner v. Genentech, Inc.*, 20-CV-06894-WHO, 2021 WL 507599, at *4–6 (N.D. Cal. Feb. 9, 2021); *Kong v. Trader Joe's Co.*, CV2005790PAJEMX, 2020 WL 7062395, at *6 (C.D. Cal. Nov. 30, 2020)).  Just last month, however, after briefing was complete on dismissal motions currently before this Court, a sister district court utilized *The 401(k) Averages Book* in the exact way in which Ms. Allison does here.  *See In re Omnicom ERISA Litig.*, 20-CV-4141 (CM), 2021 WL 3292487, at *15 (S.D.N.Y. Aug. 2, 2021).  The *In re Omnicom ERISA Litigation* decision is on point and persuasive.  In that case, the plaintiff alleged almost identical excessive recordkeeping claims as those brought by Ms. Allison:

> Plaintiffs also allege that Omnicom breached its fiduciary duties by overcharging for recordkeeping. They allege that $34 per participant is excessive given that an industry publication – "*The 401k Averages Book* (20th ed.)" – determined that the average cost of *all* administrative fees (recordkeeping plus additional administrative fees) was $35 per participant. (Compl. at ¶ 50). Omnicom's recordkeeping fees are allegedly even more unacceptable because the $35 per-participant combined fee total was an average charged to plans that were much smaller than Omnicom's – those with 100 participants and $5 million in assets, as opposed to the Omnicom Plan's $2.8 billion in assets and over 36,000 participants. Plaintiffs allege that Omnicom should have been able to negotiate a much lower per-participant recordkeeping fee, noting that Fidelity generally charges recordkeeping fees of no more than $14–$21 per participant. (Compl. at ¶ 51).

*Id.* at *15.

17

The *In re Omnicom ERISA Litigation* defendant argued "that plaintiffs fail to state a claim because the Court should not rely on *The 401k Averages Book* as a reference, as it evaluated recordkeeping fees for plans much smaller than Omnicom's, making it implausible that it could prove anything of relevance to this lawsuit." *Id*. The court disagreed, stating:

> But Plaintiffs' essential allegation is that, because the Omnicom Plan is much larger than the ones evaluated in the Averages Book, it has a stronger bargaining position than those plans and so should have been able to secure a much lower per-participant fee.
>
> Put otherwise, defendants should have been able to use its $2.8 billion in assets under management as leverage to obtain less expensive fees for participants. Whether Omnicom actually would have been able to secure a lower rate – or whether the $34 per-participant fee was reasonable in light of all that will be revealed during discovery – is a matter reserved for later.

*Id.*

This Court comes to the same conclusion here. That is, Plaintiff's essential allegation is that, because the L Brands Plan is much larger than the ones evaluated in the Averages Book, it has a stronger bargaining position than those plans and so should have been able to secure a much lower per-participant fee. Whether the Defendants actually would have been able to secure a lower rate – or whether the $56 per-participant fee was reasonable in light of all that will be revealed during discovery – is a matter reserved for later. *See also Quest*, 2021 WL 1783274, at *4 (denying motion to dismiss when "Plaintiffs allege that Defendants overpaid management fees, [and] the Plan failed to use its size and presumed negotiating power to reduce costs.")

Indeed, "'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'" *Comau LLC v. Blue Cross Blue Shield of Michigan*, No. 19-cv-12623, 2020 WL 7024683, at *6 (E.D. Mich. Nov. 30, 2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan*

*Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 718 (2d Cir. 2013)).  As stated in *Marshall v. Northrop Grumman Corp*., 2017 WL 2930839 (C.D. Cal. Jan. 30, 2017):

> It may well turn out the terms of the recordkeeping arrangement were the most favorable and prudent under the circumstances, despite Plaintiffs' calculations otherwise. But that is not the relevant inquiry here. Plaintiffs have alleged Plan participants paid recordkeeping fees significantly in excess of competitive terms for a period of at least six years, when information was available to Plan fiduciaries that could have mitigated or avoided these losses. These allegations are sufficient to survive a motion to dismiss.

2017 WL 2930839, at *11.

Similarly here, it may well turn out that the terms of the recordkeeping arrangements were the most favorable and prudent under the circumstances.  But that is not the relevant inquiry at this juncture.  Plaintiff has alleged that Plan participants paid recordkeeping fees significantly in excess of competitive terms for a period of at least six years, when information was available to Plan fiduciaries that could have mitigated or avoided these losses, which establishes the reasonable inference of an imprudent process.

### b.    Total Plan Cost – Plan Expense Monitoring

Plaintiff alleges that the L Brands Plan's excessive total plan cost shows that the Defendants breached their fiduciary duties.  Specifically, Plaintiff alleges that the Defendants "failed to monitor the average expense ratios charged to similarly sized plans for investment management fees, which together with the Plan's high recordkeeping and administrative costs renders the Plan's Total Plan Cost ("TPC") significantly above the market average for similarly sized and situated defined contribution plans." (Compl. ¶ 31.)  Ms. Allison contends that "participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider

other ways in which to lessen the fee burden on participants during the pertinent period." *Id.*

Plaintiff concludes:

> From 2014 through 2019, the Plan paid out investment management fees of 0.38%-0.46% of its total assets, a figure much higher than that of comparable plans. According to the most recent Brightscope/ICI study published in August 2020, the average TPC is 0.28%5 for plans with over $1 billion in assets, with investment management fees comprising just one component of the [Total Plan Cost] TPC. That the investment management fees for the Plan alone have been greater than the average TPC (inclusive of all plan fees) confirms the plain fact that Defendants failed to ensure that the Plan was paying reasonable fees and committed an apparent and significant breach of their fiduciary duties by failing to ensure that the Plan only paid reasonable investment management fees.

> Coupled with the excessive $56 per-participant recordkeeping and administrative fees, the total cost to the Plan was even more expensive. The Plan's TPC during the relevant period ranges between 0.51% and 0.62% of net assets. Indeed, at all times, the Plan's TPC was 0.23%-0.33% (23-33 basis points) higher than that which Defendants should have reasonably accepted or negotiated for under any circumstances and caused the Plan to incur an overpayment of approximately $17.3 million in fees from 2014 to 2019.

*Id.* ¶¶ 31, 32

> The Defendants argue that these allegations fail to state a plausible claim because:

> The L Brands Plan offers a reasonable array of investment alternatives with expense ratios ranging from 0.03% to 1.23%, Exs. G-H, consistent with the ranges that other courts have held reasonable as a matter of law. From this array, Plan participants can readily determine the level of investment management fees they are willing to pay in connection with their selections. The range of offerings and fees reflect that Defendants *did* consider lower cost options when selecting funds for the Plan.

(Defs' Mot. at 14, ECF No. 8.)

Ms. Allison responds that the range of the Plan's investment option management fees sufficiently states a claim because Plaintiff's allegations concern the *aggregate* amount of investment management fees paid by the Plan. (Pl's Mem. in Opp. at 15, ECF No. 11.) As to those fees, Plaintiff alleges that they alone amounted to 0.38%-0.46% of total assets between 2014 and 2019 and is far in excess of the average total plan cost of 0.28% of comparable plans,

of which investment management fees are only one component. *Id.* (citing Compl., ¶ 31.)  This

allegation, Plaintiff posits, is yet another straightforward "circumstantial fact" indicating a

flawed fee monitoring process because of the Plan's preternatural skew toward

expensive funds, which corroborates all the other circumstantial facts in the Complaint.  This

Court agrees.

"The key is whether [the L Brands Plan's] *process* in making its investment decisions

was imprudent." *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *13.  And "[e]ven when

the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim

alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on

circumstantial factual allegations, may reasonably 'infer from what is alleged that the process

was flawed.'" *Id.* (citing *St. Vincent*, 712 F.3d at 718 and *Braden*, 588 F.3d at 596).  Accepting

Ms. Allison's well-pleaded allegations as true, the range and mix of the Plan's investment

options do not insulate the Defendants' from their fiduciary duty to monitor the Plan expenses,

including investment expenses, which is the focus here.  *See Sweda*, 923 F.3d at 330 ("[w]e d[o]

not hold, however, that a meaningful mix and range of investment options insulates plan

fiduciaries from liability for breach of fiduciary duty. Such a standard would allow a fiduciary to

avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced

or underperforming").  Thus, the Defendants are not entitled to dismissal of this aspect of

Plaintiff's breach of fiduciary duty claim.

### c.    Failure to utilize the least expensive share class.

Finally, Plaintiff alleges that a "further indication of the Defendants' lack of a prudent

evaluation process for investment-related fees is their failure to monitor the Plan's investment

options to ensure that they were in the least expensive available share class."  (Compl. ¶ 33.)

Plaintiff continues, alleging that the Plan makes "no distinction whatsoever, other than price, between the share classes for the same investment option." *Id*. She asserts that the fund's Institutional share class (with an expense ratio of 0.97%) should have been offered instead of the Investor share class (with an expense ratio of 1.19%). *Savage v. Sutherland Global Services, Inc.*, 19-cv-06840, 2021WL 726788 (W.D.N.Y. Feb. 25, 2021) ("to the extent plaintiffs claim that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds, these allegations are sufficient to survive the motions to dismiss'") (quoting *Cunningham*, 2017 WL 4358769, at *7-*8)).

> Plaintiff explains:
>
> The share class used is typically, if not always, dependent on the negotiating leverage of the investor; in other words, large institutional investors, such as the Plan, have significant amounts of monies to invest such that mutual fund managers will agree to lower fees/offer cheaper share classes for access to those Plan assets. Despite the negotiating leverage based on the size of the Plan, Defendants neglected to utilize the least expensive share class for the following fund."

*Id*. (citing to the Artisan International Investor Fund).

The Defendants argue for dismissal of this aspect of her breach of fiduciary duty claim because, unlike the few cases Plaintiff cites, the majority of courts to review the use of more expensive share classes find that it does not create an inference of imprudence, particularly where the plaintiff identifies only a single fund of the Plan's more than twenty options that was offered in a more expensive share. (Mot. at 16, ECF No. 8-1) (citing as examples, *inter alia*, *Divane*, 953 F.3d at 992 (holding that allegations of higher-cost share classes did not create any inference of imprudence and affirming dismissal); *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) affirming dismissal where the plaintiffs argued plan should only offer institutional funds); *Kong*, 2020 WL 7062395, at *5 ("[A]mple authority holds that merely

alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach." (collecting cases));

Further, the Defendants argue that the amount paid in fees are rebated to the plan participants, which negates any reasonable inference of imprudence. The Defendants rely upon the Artisan International Investment Fund prospectus, which they contend "make[s] clear that the cost differential between the Artisan Investor share and Institutional share is returned to Plaintiff and her fellow participants who invested in that fund." (Defs' Mot. at 18) (citing to Artisan Partners, *Prospectus Artisan Partners Funds*, Feb. 1, 2021, at 114

http://hosted.rightprospectus.com/ documents/Artisan/PRO_Combined.pdf (last visited Feb. 12, 2021) (explaining that Investor shares pay some or all of a portion of the fee paid to authorized agents for services including recordkeeping, while "Institutional Shares of the Funds do not pay fees to intermediaries in connection with recordkeeping."). The Defendants' arguments are not well taken.

First, assuming arguendo that the extrinsic evidence offered by the Defendants is appropriately considered at this juncture, the revenue-sharing rebate argument only raises more factual questions, as Plaintiff contends. Specifically, Ms. Allison asserts:

> Defendants' (inappropriate) "evidence," if credible, only shows that the "revenue-sharing" portion of the cost differential is rebated to Plan participants; there is no indication that the revenue-sharing rebates and cost differential are completely congruent such that the entirety of the cost differential is passed on as rebates. Memo, at 16-18. Indeed, if Defendants' explanation were true, there would be no reason for the Plan to retain the Investor share class because its expense would be the same as the Institutional share class after the rebate, but the recordkeeper would have the additional administrative burden of calculating the rebate (and presumably charged for that service).
>
> In addition, participants would miss out on the potential appreciation and compounding effect of the rebated expense amount during the period after the expense was charged and before the rebate was credited back to participant accounts. Moreover, the language of the Plan disclosures is unclear, if not

contradictory, as to the Plan's treatment of revenue sharing. The Plan's Form 5500 provides, without qualification, that "[r]evenue-sharing arrangements . . . are not used to pay the Plan's administrative expenses, but rather are credited in the accounts of the participants." Def. Ex. F, at Notes to Fin. Stat. p.7. But the annual disclosures say, more ambiguously, that "generally, . . . if you are invested in a fund with rebates, you'll receive that fund's rebates." Def. Ex. H, at 7. Meanwhile, Plaintiff's account statements provide that the rebate is "of some or all of the amount Wells Fargo Bank receives . . . from providers of the plan's applicable investment managers," suggesting that the Plan's recordkeeper, at times, retains "some" of the revenue-sharing payments. Def. Ex. G, at 1- 2 (emphasis added).

(Pl's Mem. in Opp. at 18 – 19 , ECF No. 11.)  This lack of clarity raises factual questions regarding the nature of the rebate.

Second, while it is true that the majority of courts to review whether offering a more expensive retail share class is sufficient to carry a claim for fiduciary breach, that is not all that Plaintiff offers here.  As several sister district courts have recently explained in the ERISA fiduciary duty context, "complaints should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Disselkamp v. Norton Healthcare, Inc.*, 3:18-CV-00048-GNS, 2019 WL 3536038, at *8 (W.D. Ky. Aug. 2, 2019) (rejecting defendants' attempt to "excise[] three separate issues that it contends individually fail to state a claim for breach of the duty of prudence"); *Game Sci., Inc. v. Gamestation, Inc.*, No. 4:14CV-00044-JHM-HBB, 2014 WL 12726643, at *13 (W.D. Ky. Oct. 21, 2014) (same) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).  Given the other well-pleaded allegations discussed above, there is no reason for the Court to dismiss this corroborating allegation.  *See Terraza v. Safeway Inc*., 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) (crediting share class allegation pertaining to only one option in finding that the allegations, together, "create a plausible inference that the [d]efendants' decision-making process was flawed").

24

2. **Failure to Monitor Fiduciaries and Co-Fiduciary Breaches, and in the Alternative, Liability for Participation in Breach of Fiduciary Duty**

Plaintiffs' other two claims are entirely dependent on whether she has stated a claim for breach of fiduciary duty, and because Plaintiff has stated such a claim, Counts II and III also survive the Defendants' motion to dismiss.

Count II is a failure-to-monitor claim, which alleges that the Defendants failed to monitor fiduciaries and co-fiduciaries for which it was responsible. Since the Defendants are responsible for appointing, supervising, and removing members of the Administrative Committee that oversees the Plan, it is liable for failing to properly monitor them in administering the Plan. "An appointing fiduciary's duty to monitor his appointees is well-established." *In re Omnicom ERISA Litigation (*citing *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D. N.Y. 2005)).

A failure-to-monitor claim is an extension of a fiduciary's individual obligations to properly manage the assets under his or her control. "Courts recognize that when a fiduciary has and exercises the power to appoint and remove plan administrators, it has the duty to monitor those appointees." *McGowan v. Barnabas Health, Inc.*, No. 20-13119 (KM) (ESK), 2021 WL 1399870, at *8 (D.N.J. Apr. 13, 2021) (collecting cases). Accordingly, "Courts have been willing to find a failure to monitor claim if the plaintiff has adequately alleged a breach of fiduciary duty claim." *Id.*; *see also Falberg v. Goldman Sachs Group, Inc.*, 19 CIV. 9910 (ER), 2020 WL 3893285, at *15 (S.D.N.Y. July 9, 2020) ("Because Plaintiff's other ERISA claims survive Defendants' motion . . . Plaintiff's monitoring claim survives as well."). This is a natural extension of a fiduciary's control over a plan's administrators. If those whom the fiduciary supervises are negligent in their duties the fiduciary has a duty to remove them. "[I]f a plan administrator continually made poor investment decisions, an administrator discharging its duty to monitor should have noticed." *McGowan*, 2021 WL 1399870, at *5.

The Defendants argue that plaintiffs did not allege specific facts that demonstrate it failed to monitor any fiduciaries it supervised. But this ignores plaintiffs' allegations that the Defendants' Board appointed the members of the Plan's Administrative Committee, and Omnicom was specifically "responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee." (Compl. at ¶ 60). Plaintiff has alleged that L Brands is exclusively responsible for monitoring the fiduciaries under it, and that, as already discussed, those fiduciaries have breached their duties. This is sufficient to state a claim as to Count II. *See In re Omnicom ERISA Litig.*, 20-CV-4141 (CM), 2021 WL 3292487, at *16–17 (finding same).

Finally, in the event that any defendant is not a fiduciary or co-fiduciary under ERISA, Ms. Allison alleges a claim for a knowing breach of trust. "In the trust context, 'breach of trust' is generally interchangeable with 'breach of fiduciary duty' without any formal distinction between the two." *Reliant Transportation, Inc. v. Division 1181 Amalgamated Transit Union*, No. 18-cv-4561, 2019 WL 6050345, at *5 n.10 (E.D.N.Y. Nov. 14, 2019). The only difference is that a breach-of-trust claim can only be asserted against non-fiduciaries. Courts have generally failed to see any distinction when evaluating breach-of-trust claims versus breach-of-fiduciary-duty claims other than the fiduciary-versus-non-fiduciary consideration. *Id*. (collecting cases).

The Complaint states a claim for a knowing breach of trust. This count is pleaded in the alternative, which is permissible under Federal Rule of Civil Procedure 8(d)(2). The Defendants argue that Plaintiff has failed to plead this claim because there is nothing in the complaint that states that there was knowing participation by a non-fiduciary in a fiduciary's breach of a duty. But given the roles and the relationships of each of the specific defendants in this litigation and

26

the alleged facts that have now been discussed at length, the natural inference is that the Defendants all knew, or at the very least should have known, about the alleged mismanagement. *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at \*16–17.

**IV.**

For the foregoing reasons, the Court **DENIES** the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 7) and **DENIES** the Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted (ECF No. 8).

**IT IS SO ORDERED.**


**9/16/2021**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                         **EDMUND A. SARGUS, JR.**
                                                 **UNITED STATES DISTRICT JUDGE**